### PRICE AND OTHERS *v.* THE METHODIST EPISCOPAL CHURCH AND OTHERS.

Payment of money for burial, in the burial ground of the Methodist Episcopal Church, or burying in virtue of membership, gives no right to control the church in the appropriate use of its grounds.

Lands obtained by religious societies, can not be held as set apart for a burial ground, under the statute, unless actually surveyed, described, and platted. *Quære*, as to the record of the plat.

Lands conveyed to trustees of the Methodist Episcopal Church, for the use of that church, according to its rules and discipline, the trustees can not create any individual or public right, inconsistent with the use prescribed by the discipline.

HAMILTON County Supreme Court, May Term, 1831.

The bill states that a number of individuals, in Cincinnati, associated themselves together, as Methodists; and in 1807 purchased lots of ground, in Cincinnati, for the accommodation and convenience of themselves and others, for a place of worship and burial; and shortly after the purchase, at their joint expense, erected a place of worship, and opened a burial place, in which the members of the society had liberty to bury their dead, free of expense; and others had leave, also, to bury their dead there, on paying certain burying fees to the trustees of said society; and that from thence, hitherto, the said ground has been used as a burying ground. That the complainants and others, some of

471

whom are, or were members of the Methodist Church, *used the ground designed for that purpose* as a place of burial for their friends and relatives; and that those who were not members of the society have paid the trustees of said society a valuable consideration for the privilege of burying in said ground; and that they have incurred great expense in erecting memorials and monuments over the graves of their friends. That to secure 516] *the object of said purchase the title of said lots was made to certain trustees and their successors, to be held perpetually for the use of said society, and for objects connected with worship and the burial of the dead. That the defendants have come to a resolution to open and dig in the ground of said graveyard, and have given notice that they will remove the ground, and the remains of the dead therein lying, unless the friends and relatives of the said dead shall remove their remains and monuments from the yard. The complainants pray that the defendants may be perpetually enjoined from digging up the graves in the yard and removing the remains of the dead.

The answers admit the purchase of the lots and the building of the place of worship or church. They also admit that interments have been made in the ground adjoining the church, from time to time, by members and strangers; and that, from some, burial fees had been received; that, in the permitting interments and receipt of the fees, all has been done with the understanding that the ground was to be held and used, when necessary, for the purposes of the original trust. They deny the payment of money by any of the complainants, or that they were ever given any privilege inconsistent with the trust, or promised any; that the only disturbance threatened was in a vote of the society, in the regular course of its business, to erect a new church on the ground; and a determination of the trustees to remove, decently, to some suitable place of interment, such bodies in said burying yard as should be necessary for the convenient building a church suited to the present exigencies of the society.

The title papers, exhibited by the respondents, are:

1. A deed from J. Kirby and wife, dated September 25, 1805, to Lynes and others, trustees, etc., of the Methodist Episcopal church, of ground in dispute, to the grantees and their successors, in trust: "That they should erect and build, or cause to be erected and built, a house or place of worship for the use of the members of

472

Price et al. *v.* Methodist Church et al.

the Methodist Episcopal Church of the United States of America, according to the rules and discipline which, from time to time, may be agreed upon and adopted by the ministers and preachers *of the said church, at their general conferences in the United [517. States of America; and in future trust and confidence that they shall at all times, forever hereafter, permit such ministers and preachers belonging to the said church as shall, from time to time, be duly authorized by the general conference of the ministers and preachers of the said Methodist Episcopal Church, or by the yearly conference authorized by said general conference, and none others, to preach and expound God's holy word therein." The deed then prescribes the mode of filling vacancies and keeping up the number of trustees; and then provides that in case any of the trustees, for the time being, have advanced, or shall advance, or become responsible for any money on account of the premises, they, or a majority of them, after notice to the society, etc., may raise the money by a mortgage or sale of the premises.

2. A like deed from the same persons, dated October 19, 1807, for the same property, on the *same trust*.

3. The society, having been incorporated by the general assembly of Ohio, a deed from Kirby and wife, dated June 13, 1821, of *confirmation* to the trustees, under the act of incorporation, and their successors in office. This deed covers the same property, except about one hundred feet, before sold by the society, and contains the same declaration of trust.

It is proven, amongst other things in the case, that soon after the purchase of this ground, in 1805, interments began to be made in it, and have continued from thence until lately, permission having been occasionally given by the trustees to bury there, and fees taken for the privilege in many cases. That some of the complainants had friends and relatives interred there, and monuments erected to perpetuate their memories. That the ground was never thrown open, or set apart for a public burying ground, though in 1803, about one hundred feet in the northwest corner of it had been laid out in fifteen ranges, a plan for which had been exhibited to a meeting of the society and adopted, as appeared by their minutes, and that since then interments had been regulated by that plan.

*An injunction in this case had been allowed by a single [518 judge, in vacation; and the court was asked, on the case made,

to exercise its extraordinary power of injunction, to stay the trustees from breaking up the graves and monuments, and disintering the remains of the dead, in the ground held by them as aforesaid.

GAZLAY, for complainants:

The question to be settled, is, whether the complainants have such an interest in the subject of the suit, as to authorize the interference of a court of equity?

Who are the complainants? Some of them are members of the Methodist Church, who purchased the land; some are not, and never were members. None of them claim any legal interest to the land in dispute; but all of them claim an easement, which exists as perfectly without as with membership. This easement the complainants profess to hold without restriction as to time, and free from the let, hindrance, or disturbance of earthly power. This easement is the right to keep and preserve, in the place of their present deposit, the bodies and remains of their deceased friends and relations and to see that these remains, and their accompanying sepulchral evidence, suffer no violation, except from the relentless hand of time.

How came the complainants to this right of easement? It was granted by the trustees, as also by the Methodist Episcopal Society, at the time in possession of the ground. There is no material variation in the testimony upon this point. The ground was purchased in 1805; the church erected and interments commenced at the same time, and have been continued without objections until within two or three years past, when it was seen fit to discontinue them. The regulations on this subject have been made principally by the trustees, one or more of whom gave a written or verbal order for every interment; and since the period of charging a fee for the ground, a book has been kept, in which was entered the name of the person interred, and the sum received for the same. There is no evidence that the society have acted as a body 519] more than once on this subject, which was in 1812 *or 1813, when a meeting was called in relation to some prohibition made by the trustees, as stated in the deposition of John Wood. At this meeting the prohibition was removed. The trustees conformed to the regulation of the meeting, and interments were continued accordingly. There is, then, no doubt but that interments have

Price et al. *v.* Methodist Church et al.

been made on the west halves of lots 18 and 19, on the corner of Broadway and Fifth streets, both by the consent of the trustees and the society. They have been so made for more than twenty years without any objection, and by the general and special consent. The trustees and society have, during all this period, been in the actual possession of the ground, and exclusively controlled the same. Persons who have made interments in the ground have, by general consent, been allowed to place tombs and monuments over the bodies of their friends and relations, and to open their graves and place other bodies therein. The graveyard has been kept in strict inclosure. The answer distinctly admits that the trustees gave notice, as stated in the bill, that if the dead were not removed by a certain day, they (the trustees) would proceed. to remove the same.

Is this authority and this usage sufficient to establish the right. of *easement* claimed by the complainants? This question is settled by the cases of Town of Pawlet *v.* D., 9 Cranch, 292, and in German Lutheran Church *v.* Beatty, 2 Peters, 566. The great question settled by these cases is that a legal title is not necessary to the validity of the right in question. It is an easement, or it. is a charitable use, such as courts of equity will protect, even in the absence of all legal title. The court, as reported in 2 Peters, make use of the following language, in substance: Here is not a legal title. There is no evidence that any legal title existed. There is no grant—there is no contract for any. But here is a *dedication* of the ground to charitable or religious purposes, an easement is permitted. It has been enjoyed with the knowledge and consent of all the parties concerned. The purposes are sacred ones. This court will, therefore, protect the claimants in their enjoyment. To present the case in as favorable a light as possible for the defendants, we will suppose that Kirby had made no deed; but had barely permitted *the complainants and others to enter [520 upon the ground, erect a church, and lay out a burying ground— was present, and knew, and did not object to any of the improvements made, and this for more than twenty years. Under these circumstances, were Kirby the defendant, could he avoid the easement? Under these decisions, we say he could not, much less the defendants do so. They have purchased the ground by their trustees, for the benefit of the Methodist Society of the United States, on which to erect a church as a place of worship. To ac-

commodate members of this church, and promote their prosperity and increase their growth, they lay out and open a burying ground; to increase their funds, they sell to strangers the right of interment. For more than twenty-four years the ground has been devoted to these objects. No objections have been made. On the contrary, the objects have been sanctioned both by the trustees and the society. The complainants are both members and strangers, and include as well those named in the bill as others claiming the same right. It now does not lay in the mouths of the trustees or society to object to the use they themselves have made of the ground. They can not dispute or gainsay their own act and authority. Kirby himself could not object, were he a party.

The Methodist discipline has been referred to by defendants. This can have no bearing on the case, unless it can be shown that the complainants, when they received the right of easement, received it subject expressly to any condition named therein. The discipline can affect none but those who are parties to it by express agreement. Besides it can have no prospective bearing upon real estate—it would be a monstrous doctrine if it could.

The right of burial, and the sacredness of the grave, are not now to be the subjects of discussion. If there be anything in which the whole human family have in every age concurred, it is that the graves of the dead must be respected, and that their violation is an outrage against our best moral feelings. It is vain to talk about property, or the right of property. Such is our nature, and such the force of education, that the bare proposition to violate the sanctity of the dead, excites painful emotions. We, ourselves, in relation to *our own dead, can not consent to it— can not suffer it, without feeling that we are criminal and barbarous. Shall we inquire into the nature and origin of those feelings? Do they not belong to, and grow out of the very structure of society? Are they not necessary to it? Do they not uphold a large portion of its moral refinement, and enter deeply into its best social relations? Were not these considerations operating on the mind of the Supreme Court, when they declared that the *dedication* of land to the object in question, was sufficient cause for a perpetual injunction against disturbers?

The case is placed distinctly on this footing, viz: that the ground has been used as a place of burial by the consent of those

who possessed and exercised acts of ownership over it, and that without objection. The persons, whose friends and relatives have been placed there under such consent, are before the court. Those who consented, are before the court. The title is entirely out of the question. The court will not suffer those who consented for an indefinite period of time, now to turn round and put a period to that consent. It is contrary to an express understanding; a subject in which society has a deep and sensible interest, which ought not to be so compromitted. Any and every removal, without the concurrence of all who have friends deposited in the ground, is a violation to the full extent complained of

BROOKS, contra:

The ground assumed in the defense is:

1. That the complainants were not members of the Methodist Society, did not contribute anything toward the payment, and had no interest in the ground at the time of the purchase, in 1805.

2. That they could get no interest afterward, because the deeds were severally recorded, and expressed the particular trust to be for the purpose of erecting a meeting house, and *not* for a burying place. The deed being recorded was notice to the world; and no person could acquire any right under that title inconsistent with the trust expressed in the deeds, unless that right was acquired through and by the consent of the general conference. But, as the *deed of 1805 was not recorded until October 17, 1807, by [522 which time Russell had become a member, it may be contended that the deed was notice as to him. But we answer this objection by the book of discipline, marked A, which contains the form of the deed of settlement (see page 201), which book was published in 1804; and as it was for the government of the members of the church, it was, of itself, notice of the use for which the society held real estate. Page 202 declares the same use the deeds declare, and makes all ground held by the church subject to the rules of the general conference. Hence this discipline is notice to a member of the church.

3. That no act of the trustees, or members in Cincinnati, could amount to a dedication of the trust property to any other uses than are expressed in the deeds.

As regards the first point of defense, it is sufficient to say that the answers contradict the bill, and there is no proof to sustain it.

John Wood's deposition shows that James Russell was the only one of the complainants that was a member of the church in the fall of 1807; and he expressly says, that he does not think any others were members, or that they were here at that time. If not then residents of this country, is it probable they contributed to the payment, under an agreement to purchase?

The defendants maintain that the complainants, having no interest at the time of the purchase, could acquire none afterward which can entitle them to the prayer of the bill. It is true, most of the complainants have, at some time or other, since the purchase and before the filing of the bill, been members; but they all ceased to be members before the bill was filed. While members, they had only an interest in common with all the members of the association throughout the United States. They became members under the rules of the discipline, and were subject to these rules, and liable to be expelled for a breach of them; and whether in the character of members or seceders, or under a vote of expulsion, they could not sustain a bill to assert an individual interest in the common property.

In the case of Denton *v.* Jackson, 2 Johns. Ch. 330, 335, 337, 339, 523] it is decided that, " when a new town is erected *out of an old one, it loses its right to the use of the town property, which remains in the old town, though acquired at the common expense of the inhabitants before the division."

"Every person who has an interest, by virtue of being a member of a voluntary society, of a public nature, must be subject to the will of a majority of that society, and to the rules adopted by it." 1 Bos. & Pul. 229; 5 D. & E. 388; 4 Johns. Ch. 596.

It has been decided " that a parish may pull down pews to enlarge the church, and the minority of pew-holders have no remedy, unless it is done wantonly." 1 Pick. 91, 202.

In Wentworth *v.* Parish in Canton, 3 Pick. 344, the plaintiff claimed to recover for two pews he owned in the meeting house, which had been pulled down, together with the whole house, to erect a new meeting house. The defendant plead that the house and pews had been pulled down pursuant to a vote of the parish, etc. Chief Justice Parker says: "The property of a pew in a meeting house is a qualified property, subject to the right of a majority of the parish, to take down and destroy the house, if necessary for the purposes for which it was erected; that is, to

repair, enlarge, or re-build the same; and the minority of pew-holders would have no remedy."

In 15 Mass. 465, it is decided, "that the inhabitants of the town of Lebanon, as a congregational parish, have a right to the ministerial land, and the parson can recover it, though a large majority of the society had seceded and became Baptists."

In 7 Wheaton, 445, 468, it is decided, that "no new society, composed partly of the old parishioners, had any more right to dispose of pews than utter strangers "—p. 463.

Apply these authorities to the case at bar. A few disaffected members have seceded from the church and seek to control the majority; or, in other words, the whole body of the society, by asserting rights, which, if they ever existed, were acquired by virtue of their former membership. Admit the principle, that such a right may be sustained, contrary to the will of the majority, and all, of every denomination of Christians who had joined the society for the sake of "the loaves and the fishes," would immediately secede, and assert that right.

*By inspecting the deed of 1805 it will be found to have [524 been made in trust to "William Lyons, Robert Richardson, C. Smith, James Gibson, and James Kirby, trustees, for the purpose of erecting thereon a house of worship, for the use of the members of the Methodist Episcopal Church in the United States of America, according to the rules and discipline which, from time to time, may be agreed upon adopted, by the ministers and preachers of the said church, at their general conference in the United States of America," etc. This deed contains a covenant of warranty to the trustees and their successors, a majority of whom are now members of the church, and is sufficient to confirm to the church and its privies the perpetual and beneficial estate in the land. See 9 Cranch, 53. And this, whether the church was incorporated or not. This deed was recorded before any interments were made in the ground, and was, therefore, notice to all the world. 3 Swift's Dig. 118.

On October 17, 1807, another deed declaring the same use, and covering the premises named in the first deed and some more ground, was given, and was recorded October 22, 1807. At this time none of the complainants, save James Russell, were members. In June, 1821, the society having become incorporated for the purpose of saving the trouble of new conveyances as the trustees died,

by vesting the title in the trustees incorporated, a new deed was procured, dated June 29, 1821, reciting the former deeds in substance, and expressing the same trust as in the first deed. At this time most of the complainants were members of the church, as appears by John Wood's deposition. All the pretended right set up by the complainants is derived from these titles, hence, they having been recorded, the principle applies, "that all persons coming into possession of trust property, with notice of the trust, shall be considered as trustees, notwithstanding they have paid a consideration. 2 Mad. Ch. 125; 1 Peters, 309; 1 Sch. & Lef. 262; and in Swift's Digest it is said, "if a trustee of real estate sell it after the deed is on record, and the trust is expressed in the deed, it is notice to the world; and the purchaser would take it subject to the trust." · 2 Swift's Dig. 118.

525] *If the court recognize these principles, it seems to me they are decisive of the case; for surely the complainants can not have a better right, by virtue of paying for the privilege of interment in the ground, than an absolute purchaser with notice, who had paid a full consideration. At the time this last deed was given, the trustees had become responsible to Langrel and Williams in the sum of two thousand eight hundred and forty-six dollars and twenty-four cents, for building a meeting house, school house, and parsonage house, as will be seen by the book marked "minutes," which is made evidence by a notice from the complainants to produce it. Minutes of the Trustees, 26. To meet this debt, a part of the ground covered by the second deed, and not included in the last deed, had been directed to be sold, and was sold for twenty-eight hundred dollars, to Langrel and Williams. This sale, it will be seen, the trustees had a right to make, by the discipline and the very terms of the first and second deeds from Kirby. The deed of 1821 also declared, in addition to the former trusts, that the trustees should *maintain* on said ground a house of worship. Not a word is said, in any of the deeds, about a burying ground; but the trust declared, is expressly for the use of the living, not the dead. Not a murmur is heard from any quarter that a burying ground is not provided for. Not a syllable is found in the book of discipline upon the subject of a burying ground. All these facts go to repel the charge in the bill, that the ground was purchased for a burying ground. The answers contradict it; the circumstances contradict it. From the whole of the facts, the truth of the matter will be

Price et al. *v.* Methodist Church et al.

found to be, that when the ground was purchased there was not a dozen members of the church in Cincinnati. The lot was considered almost out of town—the house necessary for worship small, and the lot large. No formal objection being made, members of the church, whose relatives died, buried them on the north line, adjoining Mr. Spencer's lot, as proved by Wood, under the supposition that the lot was large enough for that purpose, and for a meeting house. After 1813, others, then members, were permitted to be buried, the exact time is unknown, but probably after 1824 (see pages 25 and 52 of minutes), and *then, and not before, pay [526 was taken for the privilege. All this time it had not entered into the mind of man, that the little town of 1805 would so soon, as if by the power of enchantment, spread itself over the whole plain, upon which it then appeared as a mere speck.

But when the city by its rapid improvement had extended until this ground had become the center of population; when the dozen members of the church had increased to fifteen hundred; when several additions to the meeting house had proved insufficient to accommodate the congregation, the members began to talk of removing the dead, and enlarging the house. Not a word of objection is heard, though most of the complainants were then members. This talk continued two or three years, when the schism in the church took place. Then, and not till then, arose the clamor about disturbing the sanctuary of the dead; and that, too, from persons who had been expelled, or who had withdrawn to save expulsion. Then it was first discovered to be a disrespect to the memory of the dead, and an insult to the feelings of surviving friends, to talk of removing the remains to a more retired and appropriate place.

But let the argument be addressed to the reason, and not to the prejudice of man, and who can say there is anything improper— anything sacrilegious, or disrespectful to the memory of the dead decently to remove them? Is it not often done, as the highest mark of respect that can be paid to their memory? Where is the history, sacred or profane, that does not afford examples of this kind? The bones of Joseph were removed from Egypt to Palestine; the remains of Major Andre, from New York to England; Montgomery, from under the walls of Quebec; Lawrence and Ludlow's from Halifax, and Byron's from Greece; But to come nigher home; in a sister state they have recently erected their legislative hall on the very spot whence they removed the sleeping ashes of the pil-

grim fathers of New England. And, to come to our own city, the remains of the pioneers of this country, who first penetrated, where danger attended every step, the vast forest of the Ohio valley, have been removed to give place for a house of worship. A thousand such instances may be cited, but one other will suffice. The 527] *voice of this nation has decided the question, in soliciting the bones of the father of his country to be removed from Mount Vernon. Ye daring spirits! Ye illustrious dead, to whom, under heaven, we owe the enjoyment of the best country and government on earth, are ye ready to reprove the removal of your sleeping dust, or to approve the act? Are ye ready to say, let no mark of improvement or civilization be seen near where our ashes repose— let no temples to the God of armies be built at the expense of removing our remains? Or would ye say, we lived, we toiled, we fought, we bled, we died, for the benefit of posterity? Let our bones be decently removed. Let them enjoy the fruit of our toil.

The fact is, that the most wild, barbarous, and superstitious nations entertain stronger prejudice against removing the dead than the more civilized. It is said of the Scythians, that when their country was invaded by a victorious army, they would meet it on their own frontier, and if unable to repel the invader, would retreat from post to post, until driven back to the tombs of their ancestors, and there make their last and most desperate effort, until they fell upon the graves of their fathers, which they would die to defend.

But these prejudices have, I trust, been overcome by the march of civilization and the good sense of mankind. At least with the exception of the few Scythians who yet remain among us, and whose superstition may yet prevail.

The complainants seek a perpetual injunction, to prevent the removal of bones already crumbled into dust, from ground which has long since ceased to be used for interments—ground in the heart of a daily growing city; and that, too, to the exclusion of a meeting house, the very purpose of the grant.

The defendants contend that no injunction can lie where the defendant is in possession, or where the right is doubtful. 4 Johns. Ch. 21; 6 Johns. Ch. 50; 6 Ves. Jr. 51 787; Dukens, 599. In these authorities it is said, if the complainant in his bill state the defendants are in possession, they thereby state themselves out of court. An injunction is not allowed unless the plaintiff have a

vested title, legal or equitable. This bill states the defendants are
in possession. The complainants show no legal or equitable title.
*They have no property in the ashes of those buried there. [528
"The heir may have a property in the monuments of his ances-
tors, but can bring no civil action against those who disturb their
remains, when dead and buried." But the complainants do not
claim in character of heirs, executors, or administrators, the only
way in which they could have any semblance of legal or equitable
right.

It will be seen, by Mr. Gest's plat and deposition, that there is
not room enough to build a house, sufficiently large for the con-
gregation, without disturbing the graves; and that Mr. Wood is
mistaken in supposing the church owned more ground than they do,
where he says that if the parsonage house and other buildings
were torn down a house could be built of certain size, by which
he makes seventy-five feet on Broadway to belong to the church
whereas it is less than fifty feet. See Gest's plat.

Having shown the complainants have no title, legal or equitable,
to the land, but admitting, for the argument, that they have an
easement (though they surely have not, for the reason that the
permission was not of the owners), by having been permitted, af-
ter 1813, to bury there, what can equity require of the defendants
now, more than they have offered, to wit: to remove, at the ex-
pense of the church, to their own ground, and to refund the money
to those who paid for the privilege of interment. This has been
done (see the deposition of S. Lewis, and the papers thereto at-
tached); and even this they were not bound to do, by the author-
ity in 3 Pick. 347, above cited: and the authority is conclusive as
against those who were then members. And will it be contended
that those who were not members acquire any better right than
those who were? Would a member, who had paid for a pew,
which had been torn down, to rebuild the church, by a vote of
the majority, have less claim to remuneration than the person,
not a member, who had paid for another pew in the same church?
Surely not; and yet we have seen that the member, in that case,
would have no remedy, but must submit to the will of the major-
ity. Hence, it follows that the other must also submit.

3. It is contended that this ground was dedicated to the purpose
of a burying ground. The dedication of property *must [529

be to the *public*, and not to a part of the public. "There can not be a partial dedication." 1 Camp. 263, note 6.

It appears, by the deposition of Wood, this ground has been inclosed and kept locked up from the public, and that no person could enter, even at the time interments were permitted, without an order from the trustees. The trustees have always controlled the ground; and this fact, of itself, repels the idea of a dedication.

Again: The dedication of land to public uses supposes an *act* to be done by the *owner* of the *fee*, a person having the right to make it, and that act must be *unequivocal*; and it is apprehended that a trustee of real estate can not make, by any act, however unequivocal, a dedication of land contrary to the trust expressed in the deed, and without the consent of his *cestui que trust*; and if a trustee were to attempt to make such a dedication the public would take it, subject to the trust, as a purchaser with notice would take it.

For whose use were these lots granted? I answer, for the use of the members of the Methodist Episcopal Church in the *United States*. Who had the power of controlling or consenting to a dedication? The general conference of the ministers and preachers of that society in the United States. Have they thus consented? No, it is not pretended.

When the society of Cincinnati became incorporated, it became, by the very terms of the deed, trustee in its corporate capacity for the society at large of the United States; and the power has never existed, short of the general conference, that could have dedicated this to a burying ground. See the act of incorporation of the Methodist Episcopal Church of 1827.

Again: I maintain that if the trustees in this case had been the absolute owners of the fee that the acts they have done are too equivocal, or rather, do not evidence an intention that would amount to a dedication.

It has been decided, in several cases, that if the owner of land throw open a road and let the public pass through, if he soon after put up a bar, though it be immediately thrown down, yet the erection of the bar is evidence that he did not intend to waive his right to control the way, and will prevent a dedication; and in a 530] late case, 5 Taunt. 137, Justice *Gibbs said: "If he had drawn a thread across it would have prevented a dedication." It will be found, by all the cases on this subject, that any act on the

part of the owner, even the slightest exercise of ownership, will prevent a dedication; or any disability to exercise such an act will prevent it.

In the case of Wood *v.* Veal, 5 Barn. & Ald. 454, which was trespass for breaking a yard, which had been opened as a street as far back as living memory could go; had been called a street by an act of parliament; and by virtue of that act had been paved, cleansed, and lighted by the public; watchmen had been stationed in it, and the plaintiff had known these facts, and lived by it for twenty-four years before he inclosed it; but the plaintiff repelled the presumption of a dedication, by proving that there had been a lease given, by the then owner, one hundred years before, for ninety-nine years, which had expired two years before he inclosed the ground. The chief justice charged the jury that they would consider whether there had been a dedication before the date of the lease or after it had expired, with the consent of the owner of the fee. The jury found for the plaintiff, and the chief justice said "they had found a right verdict;" and also said there could be no dedication except by the owner of the fee.

In the case of Harper *v.* Charlesworth, 1 Barn. & Cress. 674; 10 Serg. & Raw. 412, "A public foot-way, over crown land, was extinguished by an inclosure act; but for twenty years after the inclosure took place the public continued to use the way. It was held that this use was not evidence of a dedication to the public, as it did not appear to have been with the knowledge of the crown." Hence it appears to be well settled that an act of dedication must be proved, or that the owner had notice of the use.

There is a case of dedication in 4 Campbell, where the use had been for fifty years and notice proved.

In the case of Pickering *v.* Noyes, 16 Serg. & Raw. 429, decided in 1825, there had been a use of the ground for seventy-two years, and no evidence of any interruption for the first fifty-eight years of that time. There was a notice by the owner not to trespass; but the use was continued fourteen years more, when the owner brought trespass, and the action was sustained. The jury would not *presume a grant from the lapse of time without proof [531 of notice and acquiescence.

If it be contended by complainants' counsel that here was a grant of private right, I answer, that neither the trustees, nor even the members in Cincinnati, had any right which they could

grant; "for trusts and confidences are personal things, and may not be granted over to others in most cases." 3 Jacob L. D. 196.

If the complainants claim a private right they must allege it specifically in the bill. They have not alleged *who* paid for interments, and the particular interment paid for. Surely the court can not enjoin those who buried in the ground, intending to remove, and who wish to do so. It is not true that any of the present members of the church object to removing. Not one of the complainants is now a member. On the contrary, the members wish to remove their dead from this ground.

This is not like the case of Beatty *v.* Richey, 2 Peters 566, relied on by the complainants. There was a grant by Beatty; but it was contended it was void for want of a grantor. Beatty had acquiesced for thirty-five years, and until his death, and his son had admitted, for fourteen years more, that the ground belonged to the German Lutheran Church of Georgetown. The court held, that though the case must be decided on other principles than ordinarily apply between grantor and grantee, that the Lutherans had a right, by virtue of the bill of rights of Maryland, etc. (See p. 583.) It will be found that the whole case turned on that point connected with the fact of the recorded plat.

In the case in 9 Cranch, also relied on, there was no question whether there was a grant or not; but the whole question there was, which of the two grants was the best title.

It is contended by Messrs. Storer and Fox that the trustees had violated their trust, by selling the hundred feet square; but it will be seen by the deed that where the trustees were responsible for money, they were authorized to sell by the very terms of the deed. The book of minutes, page 26, shows that they were indebted to Langrel and Williams, two thousand eight hundred and forty-six 532] dollars and twenty-four *cents, being more than the proceeds of the sale forty-six dollars and twenty-four cents; and this debt was created strictly within the powers they held as trustees under the deed; and the discipline (see section 15), providing for the instruction of children (see also part 2 of the discipline, section 2), provides for the building of churches, houses, etc., and the management of schools. This debt was contracted in building houses necessary for the society, to wit: a school-house, preacher's house, etc. Page 15, of the book of minutes, shows that the school-house was to be used for other church purposes, as well as

a school. And these buildings were not erected for *profit*, as alleged by complainants' counsel. They also contend that the trust has been violated for twenty-five years. Here they are under a mistake. It was no violation of the trust to permit interments while there was yet ground enough for a church sufficiently large for the society. It will be seen by Wood's deposition that the interments were confined, in 1817, to the northern line of the ground. Those interments, and all others, have been made subject to the erection of a house sufficiently large, and it is manifest that such a house can not now be built without disturbing some of the graves at least. Surely it can not be that a court of equity will (even admitting it an oversight in the trustees to permit interments, and admitting they intended at the time to leave them undisturbed), decree a perpetual injunction, and thus defeat the trust expressed in the deed. A trustee can not bind his *cestui que trust* by any contract which would defeat his trust, as an agent might his principal; and particularly where there is notice of the trust. Can the court decree that those who wish shall not remove their dead? And if not, how will the court discover, from the bill, to which graves the prohibition shall apply? The statute of 1819, cited by complainants' counsel, is against rather than for them. That requires that the ground should be for the sole purpose of a burial ground. It must be platted, *and carefully noting its extent and situation, and be recorded*—and if so done, it shall never be used for any other purpose. Now, what is the inference, if it is not so done? Why, that the party did not intend to bind himself by thus appropriating the ground. That not being platted, recorded, *etc., it *may* be used for other purposes. This statute was  [533 to answer the same purpose as a dedication to pious uses in England; and it has pointed out' *what shall be proof of such dedication,* to wit: *survey, plat, carefully noting its extent and situation,* etc., and lastly, *recording,* none of which has been done, further than to say what had been before a promiscuous mode of interment, should be reduced to order, by burying in ranges. Again, these ranges were laid out in 1813. The statute was passed February 5, 1819. It can not have a retrospective effect, for if the church had a right to disturb the graves after 1813, and before the statute was passed, it has still that right, the statute to the contrary notwithstanding. Dash *v.* Van Kleeh, 7 Johns. 477.

487

STORER and Fox, in reply :

The question arising, under all the circumstances attending this cause, is, can the defendants be enjoined and restrained from violat-. ing the sepulchres of the dead, and the feelings and sentiments of the complainants and others, whose relatives have been deposited, under the understanding implied in all such transactions, that the bodies of the dead shall remain unmolested ?

Before we discuss the main question in controversy, a preliminary one appears necessary to be disposed of.

It is alleged in the answers, and insisted upon in argument, that the court ought not to interfere in the matter, because it would be compelling the defendants to violate their trust, under which the title is held.    It is alleged that the deeds only convey the lots to be held for particular purposes ; and that, therefore, although the defendants have already violated their trust, by appropriating the property to uses opposed and foreign to the purposes of the trust, yet the court, by decreeing that the trustees, as between themselves and the present complainants, shall perform their contracts, made with the complainants, according to the fair and honest interpretation of that contract, are compelling the defendants to violate their first contract.

To show that this argument can not avail, let us see what it leads to, if carried to the extent contended for.    It is admitted, 534]    *for instance, that the trustees have made a valid and binding contract, which ought, in equity and good conscience, to be performed and kept.    Does not the court, by refusing to enforce that contract, enable the trustees and defendants to *violate* that contract?    They certainly do; and, therefore, according to this mode of argument, the court ought not to refuse to decree according. to the prayer of the bill.

But it is only necessary for us to refer to the history of these proceedings, to show, that by decreeing in favor of the complainants, the court are not compelling the trustees to violate their trust. That trust has been violated for twenty-five years past, according to their own argument; and the person who made that deed has been knowing to this violation of the trust, and has acquiesced in it. The answer of the defendant, the Methodist Episcopal Church, shows, that as late as 1821, James Kirby again deeded this same property to the trustees of the church ; and the deed itself shows that the object was to confirm the title.    And further, it appears

the trustees had violated their trust, so far as to sell one hundred feet square of this lot; and he expressly affirms even that breach of trust, and states he has, by the request of the trustees, conveyed said one hundred feet to Langrel. Surely, then, the men who have violated the trust are the last men who should be heard to proclaim that violation in a court of justice, and that, too, for the purpose of violating another trust, more sacred than the first one.

But we deny that the trustees did commit a violation of the trust, in appropriating a part of the lot for a burying ground, so long as they kept a church on the premises, for the worship in the religion mentioned in the deed.

By referring to Mr. Wood's deposition, it will be seen, that if the other houses which they have erected (for the purposes of profit or convenience) on the lot, were removed, they could build a house large enough, in all conscience, for all the religious sects in Cincinnati. If the defendants are anxious to avoid committing, or continuing to commit, a breach of trust, it would be well for them to take down their buildings ; and the employment would be more agreeable to all persons having correct feelings upon such subjects.

*But let this be as it may, it is the *cestui que trust* only who [535 can complain of a breach of the trust. It is he, and no other person, who can come into a court of equity to enforce the trust. But it is certainly against the moral policy of the law to permit a trustee, who has committed a breach of trust, to come into court and avoid a contract solemnly made, on the ground that he made it fraudently. The relief sought can not be denied, then, upon the simple ground that the appropriating the lot for a burial ground was and is a violation of the trust.

The complainants, then, contend that inasmuch as the trustees of the Methodist Church have appropriated this spot for a burial ground, dedicated it for that use, and received a compensation for every six feet of ground used for the purpose of interment, it is out of their power to make use of the ground for any other purpose than the one for which it is so set apart.

The religious sentiments and feelings of the community are to have some weight with courts of justice in the decision of causes which may arise. And although some persons may think it a matter of perfect indifference as to the mode and manner in which the body is disposed of after life has become extinct, yet the great

mass of mankind think very differently. The idea of the body being mangled by dissection, ōr otherwise, after death, is beyond description shocking to the most of us. Hence, we see, in the neighborhood of medical colleges, the people burying their dead friends in their cellars and gardens; or, if they trust them to the public graveyard, they set a watch over them until their putrefaction becomes sufficient protection to them.

That all persons feel a sentiment of affection and esteem for their friends and relatives is further evidenced by the monuments erected to keep them in remembrance. In most countries, so strong is the sentiment, and so universally felt by the whole community, that laws, the most severe, have been enacted to punish those who attempt to disturb the repose of the dead.

Our own legislature have not been unmindful of the sentiments of the people on this particular subject. They have not only declared it highly penal to dig up, or remove, or to *assist in digging up or removing dead bodies; but have extended the offense to persons who "should break down or destroy any monument, or tombstone, erected, or set up, to perpetuate the memory of any deceased person."

We claim, therefore, that this spot of ground has been dedicated for public purposes, and that it can not be used for any other.

In all cases of dedication, no grantee is necessary. "In the familiar case, where a man lays out a public street or highway, there is, strictly speaking, no grantee of the easement, but it takes effect by way of grant or dedication to public uses." 9 Cranch, 331.

In McConnel *v.* Town of Lexington, 12 Wheat. 585, 586, the court sustained a dedication of a spring for public use, although there was no written evidence of the dedication. The opinion of the court was founded on the reasonableness "of reserving a spring for public uses; the concurrent opinion of all the settlers that it was so reserved, and the universal admission by all that it was never understood that the spring lot was drawn by any person."

So in Beatty and Ritchie *v.* Kurty and others, 2 Pet. 566, the court held that the proprietors of the town of Georgetown, in setting apart a lot, or portion of ground, for the sole use and benefit of the German Lutheran Church, so dedicated the lot to public and pious uses, as to prevent the original owner from again asserting any claim thereto.

And the learned and eloquent Judge Story, in delivering the

opinion of the court, shows clearly, that after a spot of ground has been appropriated for a place of burial, it can never afterward be used for any other purpose. Speaking of the lot given to the German Lutheran Church, he says : " It was consecrated for a religious purpose—*it has become a depository of the dead ; and it can not now be resumed by the heirs of Charles Beatty.*"

It is said, however, that no dedication of this lot, for a burying ground, has ever been made, because the church, or society, or trustees, have always retained a control over it, and have so acted as to show that a dedication for the purposes of a burial place never was contemplated.

It might be asked, then, for what purpose was the lot laid *off into ranges, in 1813 ? Why did the society reserve the [537 twelve eastern ranges, *for the interment of members of said church,. and the western ranges for the interment of strangers,* as is sworn to in the answer of defendants ? If this was not dedicating, or setting it apart for the purpose of a burial ground, what act, or conduct, on the part of the church, or society, would be sufficient to show a dedication for the purpose ?

If selling out graves is not an evidence of the intention to reserve the ground for a burial ground, it was evidence of an intention, on the part of the society, to cheat strangers out of their money. But their intention was fair at the time—they had no intention to cheat any person—they could have no such intention, for their own relatives and friends were also deposited in this common sepulchre.

It does appear, therefore, to us that it is useless to endeavor to persuade the court that the trustees and the society did not dedicate or appropriate this ground as a common burial place.

" No particular time is necessary for evidence of a dedication— it is not like a grant, presumed from length of time. If the act of dedication be unequivocal, it may take place immediately." 5 Taunt. 137.

We do not contend that it was dedicated to all persons; it is not necessary that all persons should have free access to the burial of their friends, in order to show a dedication. The case in 2 Peters could not be supported on the principle of a dedication, if that were necessary ; for the lot in that particular case was reserved "*for the Lutheran Church.*" Other denominations of Christians could claim no interest in this reservation, and yet the court rest

their decision on the simple principle that the reservation was " *a dedication of the lot to pious uses.*"

But we are not driven to rely upon any general principles of law, or upon any particular adjudications of courts, to show that when a spot of land has been set apart for a burial ground, it can not afterward be used for any other purpose. Our own legislative provisions are sufficient to secure the repose of the dead, and the best feelings of their surviving friends from being wounded by an improper removal.

By section 4 of the act of February 5, 1819, vol. xviii., reprinted 538] *page 8, entitled " an act for the incorporation of religious societies," provides, " that any lot or piece of land obtained by any religious society, by purchase or donation, and set apart for the sole purpose of a burial ground, may be by them surveyed and platted, carefully noting its extent and situation, and be recorded by the recorder of the county in which the same is situated; which lot or burying ground, *if it be occupied as such* at the time of recording, shall never afterward be *sold, transferred, conveyed, or used for any other purposes whatever.*"

The defendants, R. Richardson, B. Stewart, Christopher Smith, and O. M. Spencer, part of the trustees, in their answer, admit that the " first particular act on the part of the church, of which these defendants have any knowledge or recollection, relative to interments in said ground, was in the month of March, 1813, at which time these defendants admit that the then trustees of the church adopted a plan by which about one hundred feet square, in the northwest corner of said ground, a part of which was then filled with graves, was laid out in fifteen ranges, running north and south, etc.;" and the resolution on the first page of the minute book forwarded shows the adoption of the plan.

Here, then, is an admission of all that is necessary, as we conceive, to secure the prayer of the complainants. The statute has left no room for doubts upon the subject. The defendants admit they laid off the ground into lots for burial, and that the ground has been so used ever since, until very recently. The statute says the ground so used shall *never* be sold or used for any other purposes whatever."

Surely it will not be pretended that because the trustees neglected their duty in not placing their plat on record, their

Price et al. *v.* Methodist Church et al.

obligation to keep the ground for the purposes of burial, is less sacred.

But it is contended that, notwithstanding all this, the defendants may, if they think proper, remove the dead, and there can be no relief in this way, nor in any other mode known to the law. No language, in answer to this suggestion, could be more pertinent or appropriate than a few beautiful sentences of Judge Story, in the opinion delivered in the case of the Lutheran Church above referred to, *2 Peters, 584. He remarks: "It is a case [539 where no action at law, even if one could be brought by the voluntary society (which it would be difficult to maintain), would afford an *adequate* and complete remedy. This is not the case of a mere private trespass; but a public nuisance, going to the irreparable injury of the Georgetown congregation of Lutherans. The property consecrated to their use by a perpetual servitude or easement is to be taken from them; the sepulchres of the dead are to be violated; the feelings of religion, and the sentiment of natural affection of the kindred and friends of the deceased, are to be wounded; and the memorials erected by piety or love to the memory of the good, are to be removed, so as to leave no trace of the last home of their ancestry to those who may visit the spot in future generations. It can not be that such acts are to be redressed by the ordinary process of law. The remedy must be sought, if at all, in the protecting power of a court of chancery; operating by its injunctions to preserve the *repose of the ashes of the dead, and the religious sensibilities of the living.*"

Opinion of the court, by Judge WRIGHT:

The complainants rest their claim in argument upon the following grounds:

1. That as purchasers of the privilege of burying in the yard, they thereby acquired a right to the exclusive use, each of a portion of the soil.

2. That this ground has been dedicated to public and pious uses, as a burying yard, and that the disturbing the repose of the dead is a public nuisance, shocking to the best moral and religious feelings of community, which can not be remedied by ordinary legal process.

As to the first point. We are unable to perceive how the complainants could acquire any right to the soil, by the payment of

the burying fees. That exaction, it does not appear, was ever made or yielded to, under any agreement, understanding, or expectation, on either side, that it was the purchase of any portion of the land. No conversation looking to that end ever passed between the parties, nor was any memorandum, conveyance, deed, 540] or other instrument of *writing, of any sale, purchase, or appropriation of any portion of this ground, ever demanded or given by the parties. The probability is, these exactions were only made to defray the expense of keeping the ground inclosed and in repair; possibly for compensation to a sexton. But it is unnecessary to inquire into this matter further. At no period of time, since the first organization of government in the territory, now forming the State of Ohio, could title to real estate be acquired in the way claimed. The trustees of the church held this land as *trustees* only. The limit and extent of the trust was fully and clearly expressed in the deeds, which were formed according to the printed discipline of the society, in the possession of all the churches of the Methodist persuasion.

The deeds were recorded in the county. The discipline and record were notice alike to the members of the church, to those dealing with it, and to all the world, of the manner in which the trustees held these lots, and of the extent of their power over them. They had no right to use them for other purposes than those expressed in the deed; and if they undertook, expressly in terms, to sell and convey any part of the lots, in any other manner, or for any other purpose than is expressed in the conveyance, their acts would be void.

Can it be successfully maintained that persons trading with trustees or others, standing only in fiduciary relation to the subject of the trade, can acquire any more or greater rights than the trustees have powers to grant? We think not. The payment of money for interment is no uncommon thing, but has never been understood as the purchase of a right. It is a charge upon the estate of the deceased, and stands in place of an original contribution for the purchase of the ground, for repairs, and for protecting the ground. Comyn's Dig., Cemetery, A. 3, B. 324, 326.

If the claim of the complainants be placed on the ground of membership and contribution to the purchase of the lots, it will not be found much more favorable. Property of this kind, acquired by the common contribution of the members of an associ-

ation, is subject to their common control. No separate interest is acquired; and such property is managed by the majority. Even a vote to divide, gives to individuals *no right to enforce [541 any separate interest. Denton *v.* Jackson, 2 Johns. Ch. 320–329.

The interest of the members of the Methodist Episcopal Church assimilates very near to that of pew-holders in a church. The right to pews is limited and usufructuary, and does not interfere with the right of the parish to pull down and rebuild the church. Freligh *v.* Pratt, 5 Cowen, 496. Even an individual, not a member of the society, who purchased and paid for a pew, and occupied it thirty years, acquires but a qualified property in it, subject to the common control; and if it be determined to pull down the church, the minority of pew-holders have no remedy, unless it is done wantonly. Gray *v.* Baker, 1 Mass. 435; Daniel *v.* Wood, 1 Pick. 102; Wentworth *v.* Parish in Canton, 3 Pick. 344; Commonwealth *v.* St. Mary's Church, 6 Serg. & Raw. 508; Mason *v.* Muncaster, 9 Wheat. 445; Terret *v.* Taylor, 9 Cranch, 52; Green *v.* Willer, 6 Johns. 41. See also 4 Johns. Ch. 596, and 6 D. & E. 396.

Upon the best reflection we have been able to bestow upon this branch of the question, we are brought to the conclusion that the complainants have failed to establish their right to the interference of this court by injunction.

As to the second point. It is urged that the property has been dedicated to the public as a burying ground, under the act of the general assembly of Ohio, February 5, 1819, 17 Ohio Laws, 120, for incorporating religious societies. Section 4 of that act provides: " That any lot or part of lot, obtained by any religious society, by purchase or donation, and *set apart for the* SOLE *purpose of a burial ground*, may be by them surveyed and platted, carefully noting its extent and situation, and be recorded by the recorder of the county in which the same is situated, which lot or burying ground, *if it be occupied as such, at the time of recording*, shall never afterward be *sold, transferred* or *used for any other purposes.*" The complainants contend that the platting the fifteen ranges of burying blocks and the resolution adopting the plan brings this case within the statute of Ohio. We will examine this claim, as it regards the one hundred feet platted into burying blocks, and if it shall be found that the *statute does not embrace that portion [542 of the lots, it will hardly be contended it does the residue. Was the one hundred feet *set apart* for the *sole purpose* of a *burying*

495

*ground?* Was it platted and recorded? At the time it was recorded was it *used* as a burying ground? The lot was purchased for a meeting house or church; certain persons, members and others, were permitted to bury their deceased friends there. The conveyances not only give no authority for such burials, but contain express limitations of the trust to other uses that may be inconsistent with the use claimed. There is no evidence that the lot was ever, in fact, set apart for the sole use of a burying ground, or intended to be so set apart. It has never been recorded as a burying ground. By the *minute* of the society referred to, it appears that a plan of the blocks was exhibited containing fifteen ranges, which plan was approved; that the ranges and blocks were ordered to be designated at each end by stakes, etc.; that the plat should be deposited with one C. Smith, who should designate future interments.

The evidence does not show that the ground was ever finally surveyed and platted, or that the ranges and blocks were marked and designated by stakes, or otherwise, or their extent and situation arefully noted. There was no order for the record nor any record ever made. There is no order setting apart this ground for the *sole purpose* of a burying ground. The plan of the fifteen ranges may have been a rough sketch only, upon which the meeting may have intended to take further steps under the law; but we have no evidence that they did do anything more. The provisions of this act innovate upon the settled general law of acquiring title to real estate, and its provisions must be substantially followed, or no rights can be gained under it.

The transfer of real estate to the public or to individuals, under the operation of law, without grantee or deed, can only be sustained where a clear case is presented, leaving no doubt of such legal operation. The requisitions of the statute are not satisfied by the acts of the trustees or society in the case before the court. The substantial provisions of the act have not been followed. But it is said that the trustees here shall not avail themselves of 543] their own neglect to cause *their plat to be recorded to avoid the dedication claimed by the complainants. It is a sufficient answer to this assumption, to say that the law referred to, has not been complied with, in its other requirements. It will be time enough to decide that question when a case shall be presented where the substantial provisions of the act have been all complied with, and

there appears only a neglect to place the plat on record. There is strong reason for supposing, however, that the placing the plat on record, and thus giving it publicity, is essential to the passing title to real estate under its provisions.

The counsel for the complainants urge, with great earnestness, that the acts of the defendants amount to a dedication of this lot, to public and pious uses, which is to be sustained upon general principles ; and several adjudged cases are referred to as settling this claim beyond dispute. The case of Woodyard *v.* Haddon, 5 Taunton, 125, is cited. In that case, the plaintiff had erected and opened a street, leading from a public highway across his own lands, and terminating at the defendant's close. This had been used for twenty-one years, and had been paved and lighted at the public and private expense. It was claimed that this was a dedication to *public use;* but Chief Justice Mansfield was of a different opinion, and the jury found that the land had not been dedicated to the public. On a motion for a new trial the case was fully argued, and Judges Mansfield, Gibbs, and Heath decided that the land was not dedicated to the public, while Judge Chambre was of a contrary opinion. The opinion of Chambre is cited to us as the law of the case.

The Town of Pawlet *v.* Clark et al., 9 Cranch, 292, is relied on. In that case there was a grant, by the crown, to sixty-three persons, of twenty-three thousand and forty acres of land, in the town of Pawlet, six miles square. The tract was divided into sixty-eight shares, four of which were reserved—one for a glebe of the Church of England. The court determined that the Church of England was not a body capable of receiving the grant *eo nomine;* that a grant at common law may be made to pious uses before a grantee is in existence, capable of taking ; and if made by the crown, it could not be resumed at the pleasure of the crown. That the State of Vermont, which, after the revolution, succeeded to *the [544 rights of the crown in the glebe, might alien the land, with the assent of the town ; or might erect there an Episcopal church, and collate its parson, who would thereby become seized of the glebe, *jure ecclesiæ,* and become a corporation capable of transmitting the inheritance. We do not perceive the bearing this decision has on the case before the court. The legal dedication of land to the public use, without an individual grantee, we shall have no occasion to dispute.

In the case of McConnel *v.* Town of Lexington, 12 Wheat. 585 586, the court sustained the dedication of a spring for public use, without an individual grantee or written evidence, upon the reasonableness of the dedication. The lots in that town had been disposed of by lottery draft, and the court predicated their decision upon the concurrent testimony of all the settlers, that the spring was so reserved, and the universal opinion that *no person* had drawn the spring lot.

The case of Beatty and Ritchie *v.* Kurtz et al., 2 Pet. 566, is most earnestly pressed upon our consideration as conclusive authority in the case at bar. In that case, Beatty and Hawkins, in 1769, laid out an addition to the town of Georgetown, the lots of which addition were laid down on a map, on which was set apart a lot for the sole use of the German Lutheran Church, as their absolute right and property, to be held by them for *religious purposes and the use of the congregation.* This plat was duly recorded, according to the laws of Maryland. Shortly afterward the Lutheran society took possession of the lot, inclosed it, built a church on it, and opened a burying ground. They had from thence continued to hold it upward of fifty years, and used it as a burying ground, without their title being called in question.

They were put in possession by Beatty, who declared the lot to be *the property* of the Lutherans, and that he was ready to convey the title; and both he and Hawkins died without claiming or disposing of said property. Ritchie, the heir, entered upon the lot and tore down the fences and tombstones, and was about breaking open the graves and removing the remains of the dead. The Lutherans filed their bill to compel a conveyance of the lot in fee, to be quieted in their possession and use, and for an injunction upon the defend- 545] ants *from interrupting or disturbing it. The court sustained the bill, on the ground that there was a dedication of the lot to public and pious uses. In this decision they make express reference to the laws and bill of rights in the constitution of Maryland, which gave validity " to any sale, gift, lease, or devise of any quantity of land not exceeding two acres, for a church, meeting, or other house of worship, and for a burying ground, which shall be improved, enjoyed, and used *only for such purpose;* " and also to the laws of Maryland, for laying out and recording town plats, which contains similar provisions to the law of Ohio, on the same subject. The court determined that in such cases of dedica-

tion it was not requisite there should be a legal grantee at the time of the dedication. That was a case of *dedication* by the ancestors of the defendants, at an early period, without grant, by *designation* on the original plat of the town, and the record thereof under the laws of Maryland.

The Lutheran society were put in possession by the proprietors, and had quietly occupied for more than half a century, without interruption from them, and accompanied by their repeated declarations of the rights of the Lutheran society. After all which, the heirs of the proprietors were attempting to reclaim the possession of the lot, and to appropriate it to their own private use, on the ground that the title had never passed out of their ancestors. The court very properly determined, that in such case an individual grantee was not necessary to an effectual dedication of the lot at law. Were a similar dedication made by the proprietors of a town in Ohio, under our statute, by designation on the plat of the town, and a record made according to the provisions of the act for incorporating religious societies, referred to by counsel, we should without difficulty find an analogy of principle, sustain the dedication, and exercise the same power to restrain undue interference with the public or church rights, acquired under the dedication. And in the present case, if Kirby, the grantor, or his heirs, were seeking to reclaim these lots, as forfeited by the burials which have been made in this yard, we should not hesitate to restrain them.

The learned and eloquent Judge Story, in closing the opinion of the court, in the case last referred to, remarks: *" This is not [546 a case of a mere *private* trespass; but a *public* nuisance, going to the irreparable injury of the Georgetown congregation of Lutherans. The property consecrated to their use, by a perpetual servitude or easement, is to be taken from them; the sepulchres of the dead are to be violated; the feelings of religion, and the sentiments of natural affection of the kindred and friends of the deceased, are to be wounded; and the memorials, erected by piety and love to the memory of the good, are to be removed, so as to leave no trace of the last home of their ancestry, to those who may visit the spot in future generations. It can not be that such acts are to be redressed by the ordinary process of law. The remedy must be sought, if at all, in the protecting power of a court of chancery, operating by its injunction to preserve the repose of

the ashes of the dead, and the relígous sensibilities of the living." With these sentiments and feelings we fully accord, and where a case is presented analogous in principle, shall be ready to apply the proper remedy. But the case in hearing bears no analogy to the Lutheran case. It is governed by certain fixed principles of law, over which this court can exert no control.

By a recurrence to the title papers, a part of this case, all must clearly perceive the nature and extent of the grant made by Kirby and wife to the trustees of the Methodist Episcopal Church. The object and limit of the estate granted in trust, is in the deed defined and distinctly marked out. The trustees "shall erect and build, or cause to be erected and built, a house or place of worship, for the use of the Methodist Episcopal Church of the United States," according to the rules and discipline of said church, at its general conference, and to maintain the same forever, permitting the preachers and ministers, authorized by the general or yearly conference of said church, to expound God's holy word therein, and none others. Nothing is said in either of these deeds or dedications of trust on the subject *of any other use whatever.* In the Lutheran case, the dedication was to the *use and benefit of the Lutheran Church, to be their absolute right and property, and held for religious purposes and the use of the congregation.* In Kirby's declaration of trust, the *erecting and maintaining a place of worship for* the members of the Methodist Episcopal Church, according to the rules and discipline of *their conference or government, is *the main,* if not *the only object of the grant.* There is no ambiguity in the terms of the grant, or room for any latitude of construction. No other use or purpose is expressed. Can a court of chancery change a trust expressly declared by the grantor in trust? It may enforce the trust, and compel the execution of its provisions, according to the design and purpose of the grantor, but can it divert the trust, and so construe it as to defeat and thwart the object and purpose of its creator? We think not. The trustees of the Methodist Episcopal Church take these lots under Kirby's deeds in fee, as trustees of an expressed trust, limited and declared on their face. There is nothing left to implication or inference. It is an admitted principle, not only that the rules of property should be the same in equity as at law, but that the rules of construction should be so likewise.

Courts of equity, therefore, when trusts are actually and finally

limited, generally follow the rules of the courts of law. Jeremy's Eq. Jur. 30; 2 Burr. 1108; 14 Viner's Ab., title Intent; 2 Ves. Jr. 655, and 1 Jacob & Walker, 571. If this be correct, and we believe it is, let us inquire whether *at law* we could extend this trust, so as to cover individual or public rights, resulting from *use* and *occupation*, not only beyond the trust expressed in the deed, but inevitably tending to the destruction of the trust itself. It will not be seriously contended, that a court of law could do this. If, then, the rule of property and construction is the same in this court as in a court of law, there would seem to be an end of the inquiry. The trust expressed in the conveyances must govern; and unless we can find some general expression in the trust, embracing the claims set up by the complainants, we can afford them no aid or relief. We have looked in vain for any such claim or expression. Injunctions are not allowed where the complainant's right is doubtful, nor unless he show a vested title, legal or equitable, or such a public interest which any one may ask to have protected. Corporation of New York *v.* Mapes, 6 Johns. Ch. 50; Storm *v.* Mann, 4 Johns. Ch. 21. The complainants in this cause have shown no such interest or right.

The express trust declared by Kirby, being to secure, forever, a church or place of worship for the members of the *Meth-  [548 odist Episcopal Society, we conceive it to be within the legal and equitable construction of the trust, to allow the trustees, as the society increases in numbers, and its exigencies require, to enter upon the lots granted, in order to erect a new and larger edifice than the one originally erected. The kind of building adapted to the convenience of the society, and the part of the lot on which it shall be built, are matters necessarily and legally left to the sound discretion of the trustees, aided by the advice of the congregation. They must be taken to act in good faith, until the contrary be alleged and proven. We can never *presume* their acts wanton, in the absence of all evidence. No such inference can be drawn from the vote of the society, and the resolution of the trustees, to build a new church. We should incline to restrain them from any wanton breaking up of the graves in this yard, though we see no necessity for deciding this question now.

From the view taken of this case, it results that the trustees have a legal and equitable right, under Kirby's deed of trust, to determine, in good faith, the necessity of erecting a new church or place of worship, its dimensions and site, having regard to the

convenient enjoyment, by the society, of the lots, for the purpose of the grant; that, in order to execute the trust fairly, they may so far interfere with the interments made on the lots as may be necessary to lay the foundations of the new church; and in executing their work, they may disinter, and decently remove the remains of any dead within such limits—forbearing any act calculated to shock the feelings of surviving friends or the public.

We do not intend to express any opinion, encouraging the idea that the trustees of the Methodist Church can appropriate this ground to any other purpose than the erection and maintenance of a suitable and convenient church for the society, upon the plan agreed upon by the society, or the trustees; nor further interfere with, or disturb the remains of the dead, buried there, than is necessary to effect that object.

The bill is dismissed, and the injunction dissolved. Each party to pay their own costs.

N. B. Judge COLLET, who allowed the provisional injunction in the above cause, was present when the decision was made, and concurred with the court in the principles decided.